IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CLARENCE LUKER, #276254, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-557-TFM |
| | ) | [WO] |
| | ) | |
| DR. JEAN DARBOUZE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on claims presented by Clarence Luker
["Luker"], an indigent state inmate, challenging the medical treatment provided to him for
chronic back pain during a previous term of incarceration at the Easterling Correctional Facility
["Easterling"].  *Amended Complaint - Doc. No. 11* at 2-3.  Luker names Dr. Jean Darbouze as
the defendant in this cause of action.  Luker seeks monetary damages for the alleged violations
of his constitutional rights and requests issuance of an order requiring the provision of specific
types of medical treatment for his back.  *Id*. at 4; *Amendment to Amended Complaint - Doc. No.
16* at 2-3.

The defendant filed a special report, relevant supporting evidentiary materials, including
affidavits and medical records, and responses to requests for discovery addressing Luker's claims
for relief.  Pursuant to the orders entered in this case, the court deems it appropriate to construe
the aforementioned report as a motion for summary judgment.  *Order of September 21, 2012 -*

*Doc. No. 25*. Thus, this case is now pending on the defendant's motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof, the discovery materials submitted by the defendant and the plaintiff's response to the special report, the court concludes that the defendant's motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing

---

[1]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id*. "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current version of the rule.

that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

The defendant has met his evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of [prison medical personnel]. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted). Consequently, to survive the defendant's properly supported motion for summary judgment, Luker is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claim of a constitutional violation. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*.  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted."  *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."); *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest*

*Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to

5

a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Luker fails to demonstrate a requisite genuine dispute of material fact so as to preclude summary judgment. *Matsushita*, *supra*.

## III.  DISCUSSION

### A.  Suit Against the Defendant in His Official Capacity - Absolute Immunity

To the extent Luker sues the defendant in his official capacity, Dr. Darbouze is immune from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916

6

F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendant is a state actor entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from him in his official capacity.  *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## B.  Deliberate Indifference

Luker complains that upon his transfer to Easterling in February of 2011 Dr. Darbouze failed to provide him adequate medical treatment for his chronic back pain which resulted from osteoarthritis and ensuing bone spurs.  Specifically, Luker asserts that Dr. Darbouze failed to provide him appropriate medication for his pain, denied him surgery, and refused to issue medical profiles for a bottom bunk and no prolonged standing.  The defendant adamantly denies he acted with deliberate indifference to Luker's medical needs and, instead, maintains that Luker received all necessary and appropriate treatment in response to his complaints of back pain.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendant acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).

Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106,

97 S.Ct. at 292; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal

quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge

of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a

delay in [the acknowledged necessary] treatment."

> That medical malpractice-negligence by a physician-is insufficient to form the
> basis of a claim for deliberate indifference is well settled.  *See Estelle v. Gamble,*
> 429 U.S. 97, 105-07, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,*
> 61 F.3d 1537, 1543 (11th Cir.1995).  Instead, something more must be shown.
> Evidence must support a conclusion that a prison physician's harmful acts were
> intentional or reckless.  *See Farmer v. Brennan,* 511 U.S. 825, 833-38, 114 S.Ct.
> 1970, 1977-79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491
> (11th Cir.1996) (stating that deliberate indifference is equivalent of recklessly
> disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543
> (stating that plaintiff must show more than mere negligence to assert an Eighth
> Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d
> 1176, 1191 n. 28 (11th Cir.1994) (recognizing that Supreme Court has defined
> "deliberate indifference" as requiring more than mere negligence and has adopted
> a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d
> 949, 955 (7th Cir.1999) (stating "deliberate indifference" is synonym for
> intentional or reckless conduct, and that "reckless" conduct describes conduct so
> dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need ...,

Plaintiff[] must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to

that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser*

*Int'l, Inc.*, 588 F.3d 1291, 1306-1307 (11th Cir. 2009).  When seeking relief based on deliberate

indifference, an inmate is required to establish "an objectively serious need, an objectively

insufficient response to that need, subjective awareness of facts signaling the need and an actual

inference of required action from those facts."  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d

at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to

the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and

disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists and

he must also draw the inference."  *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164,

168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just

knowledge of symptoms, and ignore a known risk to the serious condition to warrant finding of

deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he

should have perceived but did not, while no cause for commendation, cannot under our cases be

condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate
> indifference, ... the Supreme Court has ... emphasized that not 'every claim by a
> prisoner that he has not received adequate medical treatment states a violation of
> the Eighth Amendment.'  *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291; *Mandel*, 888
> F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so
> grossly incompetent, inadequate, or excessive as to shock the conscience or to be
> intolerable to fundamental fairness.'  *Rogers,* 792 F.2d at 1058 (citation omitted).
> Mere incidents of negligence or malpractice do not rise to the level of
> constitutional violations.  *See Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 ('Medical
> malpractice does not become a constitutional violation merely because the victim
> is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical
> malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871
> F.2d at 1033 (mere medical malpractice does not constitute deliberate
> indifference).  Nor does a simple difference in medical opinion between the
> prison's medical staff and the inmate as to the latter's diagnosis or course of
> treatment support a claim of cruel and unusual punishment.  *See Waldrop,* 871
> F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that [the] defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law.").  Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment."  *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).  Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records.  *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

The affidavit filed by Dr. Darbouze addresses the allegations made by Luker.  A thorough review of the evidentiary materials filed in this case demonstrates that this affidavit is corroborated by the objective medical records contemporaneously compiled with the treatment provided to Luker regarding the instant claim of deliberate indifference.  Dr. Darbouze provides

10

the following explanation of the treatment afforded Luker.

Mr. Luker transferred from Kilby Correctional Facility ("Kilby") to Easterling on February 24, 2011. After his arrival at Easterling, Mr. Luker did not submit any sick call request forms or otherwise complain about any back condition or discomfort for over a month. On March 31, 2011, Mr. Luker submitted a sick call form stating "I have a messed up back and left hand, both are hurting me, mostly my back, I also have Arthritis." The medical staff stamped his request as received on April 1, 2011, and scheduled an appointment for that same day.

When the nursing staff met with Mr. Luker on April 1, 2011 [to evaluate his condition], he stated that the "date of onset" for his hand and back pain was approximately two weeks earlier. Mr. Luker did not state any reason or cause for the onset of this discomfort. The nursing staff performed an examination of Mr. Luker's back and left hand. With respect to his hand, the nursing staff noted that one of his fingers did not have full range of motion, but did not note any other abnormalities. The examination of Mr. Luker's back did not reveal any objective abnormalities in that Mr. Luker's back was not weak, his range of motion was within normal limits, his back was not swollen and it was not tender to the touch. However, Mr. Luker did state that he experienced pain with movement. To help alleviate Mr. Luker's discomfort, the nursing staff provided him with Tylenol. Despite Mr. Luker's complaint of back and hand discomfort, he did not pick up his Tylenol on three different occasions during pill call.

On April 15, 2011, I met with Mr. Luker to further evaluate his complaints of hand and back discomfort. During our meeting, Mr. Luker stated that he experienced chronic lower back pain resulting from an injury while painting houses five years earlier. He stated that his hand pain resulted from a stab wound which he sustained in county jail a year earlier. During our appointment, I reviewed Mr. Luker's medical records and noted that the medical staff at Kilby previously performed an x-ray of Mr. Luker's hand dated February 11, 2011, which showed a "normal left hand" with proper joint alignment, no fractures or dislocations and no appreciable soft tissue swelling. Despite his "normal" x-ray results, I ordered Mr. Luker a soft rehabilitation ball to exercise his hand and increase his range of motion. Due to Mr. Luker's complaints of hand and lower back pain, I ordered 20 mg of the muscle relaxer Baclofen to be taken twice a day for two weeks and 500 mg of Naproxen which is commonly used to treat the pain, swelling and stiffness associated with arthritis to be taken twice a day for four weeks. Again, despite Mr. Luker's complaints, he missed four doses of Naproxen and one dose of Baclofen during pill call.

In addition to treating the symptoms of Mr. Luker's complaints, I also ordered an x-ray of his lower spine to determine the nature of his lower back

complaints.  That same day, the medical staff performed the x-ray which showed "mild degenerative osteophytic spurring."  Osteophytic spurs, otherwise known as bone spurs, are bony growths that develop near joints and connective tissue as a result of stress, pressure or arthritis.  The first, and typically, best course of treatment for bone spurs is pain management.  This is particularly true when the individual's condition is not debilitating.  More invasive treatments, such as surgery, are reserved for severe cases due to the potential complications which could result from surgery.  In fact, even after a successful surgery, an individual with "mild" bone spurs may experience more complications and pain following surgery than he experienced prior to surgery.

Mr. Luker submitted a sick call request form dated April 21, 2011, with the complaint of left hand and back discomfort.  He also requested a special needs profile granting him a bottom bunk and special boots.  The next day, on April 22, 2011, the nursing staff met with Mr. Luker.  The nursing staff did not note any new symptoms or other abnormalities with regard to Mr. Luker's hand.  However, during the examination of Mr. Luker's back, he stated that he was experiencing numbness, weakness and back spasms.  Based on these additional complaints, the nursing staff referred Mr. Luker to me.

Before I could meet with Mr. Luker for our follow-up appointment, he submitted an additional sick call request regarding his back and left hand discomfort.  The nursing staff met with Mr. Luker that same day at which time he stated that his pain was an eight out of ten.  To help alleviate Mr. Luker's discomfort, the nursing staff provided him with 650 mg of Tylenol to be taken twice a day for the next five days.  Despite his complaint that his pain was an eight out of ten, Mr. Luker did not pick up three of his ten doses of Tylenol.

On September 13, 2011, I met with Mr. Luker regarding his back and hand discomfort.  During this visit, Mr. Luker stated he was still experiencing discomfort in his hand and lower back.  I again prescribed him 20 mg of the muscle relaxer Baclofen to be taken twice a day for ten days and 500 mg of the pain medication Naproxen to be taken twice a day for thirty days.  Over the next thirty days, Mr. Luker missed 34 doses of Naproxen and one dose of Baclofen. I did not provide Mr. Luker any special needs profiles because these profiles at this time are reserved for individuals with, among other things, serious deformities or disabilities and mild bone spurs do not fit either classification.

During the two and one-half months following our September 13, 2011, appointment, Mr. Luker did not submit a sick call request form or otherwise seek medical care for his hand or back.  On December 2, 2011, Mr. Luker submitted a sick call request form stating that he was again experiencing pain in his back. Based on his complaint, I prescribed Mr. Luker Tylenol to be taken twice a day for five days to help alleviate his discomfort.  Mr. Luker, nonetheless, missed seven of his ten doses of Tylenol.  I met with Mr. Luker for a follow-up

appointment on December 12, 2011, at which time he stated that he was still experiencing discomfort in his back and hand, but that the Naproxen provided relief. At this time, I prescribed him 500 mg of Naproxen to be taken twice a day for sixty days. Over the next two months, Mr. Luker missed over eighty doses of Naproxen during pill call.

Mr. Luker submitted a sick call request form dated January 17, 2012, stating "Slipped in shower hurt back have pains, left hand." The medical staff stamped the form as received on January 17, 2012, and scheduled an appointment for the same day. However, Mr. Luker signed a release of responsibility form stating that there was "no need for sick call."

Despite Mr. Luker's failure to take over eighty doses of his pain medication over the previous sixty days, he submitted a sick call request form dated February 12, 2012, in which he stated that he needed his medications renewed. The nursing staff met with Mr. Luker the same day and provided him with a five-day supply of Tylenol of which he missed two doses. The medical staff scheduled a follow-up appointment for Mr. Luker to meet with me on February 20, 2012. However, Mr. Luker left the Health Care Unit on that date before our appointment commenced. Mr. Luker signed a release of responsibility form dated February 22, 2012, acknowledging that he left before seeing me.

Following his absence from our February 20, 2012, appointment, Mr. Luker submitted a sick call request form dated February 23, 2012, in which he stated that he needed to meet with me regarding what he termed the deterioration of his spinal cord. The medical staff marked his form as received on February 24, 2012, and met with him that same day. To help alleviate Mr. Luker's discomfort, the nursing staff provided Mr. Luker with a five-day supply of Tylenol. The medical staff scheduled a follow-up appointment with me for March 7, 2012.

I met with Mr. Luker for his follow-up appointment on March 7, 2012. Due to his continued complaints regarding his back and hand, I prescribed him Motrin to be taken twice a day for thirty days and a muscle relaxer named Robaxin. Mr. Luker missed ten doses of Robaxin and eight doses of Motrin. At this time, I told him to follow up with me in two weeks. On March 21, 2012, Mr. Luker was scheduled to meet with me for our follow-up appointment, however, Mr. Luker left [the health care unit] before seeing me and signed a release of responsibility dated March 21, 2012, acknowledging as much.

Mr. Luker submitted a sick call request dated April 7, 2012, stating that he needed his medications renewed. The nursing staff met with Mr. Luker two days later on April 9, 2012, and provided Mr. Luker with Tylenol for the next five days. Then, on April 17, 2012, I met with Mr. Luker and prescribed him 800 mg Motrin to alleviate his discomfort.

On May 11, 2012, Mr. Luker submitted a sick call request form stating that his medicine was hurting his stomach, that he wanted a bottom bunk profile and

that he wanted to keep his medications on his person.  He stated that he also wanted x-rays of  his left hand and fingers "for courts."  The medical staff stamped his form as received on May 14, 2012, and scheduled an appointment for the same day.  On May 14, 2012, the nursing staff met with Mr. Luker who stated that he wanted a bottom bunk profile.  He also stated that the Ibuprofen was hurting his stomach.

On May 22, 2012, I met with Mr. Luker regarding his complaints that his medication was hurting his stomach.  I prescribed him Prilosec for sixty days, Tylenol for thirty days and Baclofen for fourteen days.  I also discontinued his Motrin at this time.  Mr. Luker missed 24 doses of Prilosec before I discontinued it on July 2, 2012, and missed 25 doses of Tylenol.  Again, I did not provide Mr. Luker with any special needs profiles because he did not have a serious deformity or disability [warranting issuance of a medical profile].

On June 20, 2012, Mr. Luker submitted a sick call request form stating that he had discomfort in his back and left hand.  The medical staff stamped the form as received on June 21, 2012, and scheduled an appointment for the same day.  When the nursing staff met with Mr. Luker on June 21, 2012, he stated that he had lower back pain and left hand pain which he rated an eight out of ten. I met with Mr. Luker on July 2, 2012, regarding his complaints of back and hand discomfort.  At this time, I renewed his Baclofen for an additional 14 days.

On July 16, 2012, Mr. Luker submitted a sick call request form stating that he needed his medications renewed.  The medical staff stamped the form as received on July 17, 2012, and scheduled an appointment for the same day.  The nursing staff met with Mr. Luker for his appointment on July 17, 2012.  The nursing staff did not note any new symptoms during their evaluation of Mr. Luker.  When I met with Mr. Luker for his follow-up appointment on July 25, 2012, he requested injections instead of pills to help alleviate his discomfort.  I, therefore, provided Mr. Luker with an injection of Solumedrol which is an anti-inflammatory.

During Mr. Luker's incarceration at Easterling, I did not at any time ignore any of his requests for medical treatment.  I did not deliberately ignore any of his medical complaints or interfere in any way with the provision of medical care to him at any time....

*Exhibit 1 to the Defendant's Special Report (Affidavit of Dr. Jean Darbouze) - Doc. No. 23-1*

at 5-11 (citations to medical records omitted).

The court has likewise undertaken a thorough review of the sworn responses of Dr. Darbouze to interrogatories propounded by Luker.  In his response to Luker's first set of

interrogatories, Dr. Darbouze explains "that Plaintiff was not provided with any special needs profiles because these profiles are reserved for individuals with, among other things, serious deformities or disabilities.  As stated previously [in the affidavit submitted in support of the special report], Plaintiff's x-rays indicated that he suffered from mild degenerative osteophytic spurring or mild bone spurs.  In [my] professional medical opinion and based upon the variety of information obtained ... during [my] treatment of Plaintiff, Plaintiff's current medical condition does not rise to the level of a serious deformity or disability warranting issuance of a special needs profile.... [Additionally,] Plaintiff's mild degenerative osteophytic spurring condition is best treated, in [my] professional medical opinion, by pain management. Osteophytic spurs, or bone spurs, are typically treated first by pain management.  This is particularly true when the individual's condition, such as Plaintiff's, is not debilitating.  Invasive treatments, such as surgery, are typically reserved for severe cases due to the potential complications which can result from these invasive surgical procedures.  In fact, even after a successful surgery, an individual with mild bone spurs may experience more complications and pain following surgery than experienced prior to surgery.  Therefore, in [my] professional medical opinion, Plaintiff's condition is best treated with pain management."  *Defendant's Responses to Plaintiff's Interrogatories - Doc. No. 44* at 1-3.

In addressing additional interrogatories submitted by Luker, "Dr. Darbouze states that in his best medical judgment the pain medication prescribed for Plaintiff's osteoarthritis was and is the best medical treatment available for Plaintiff....  Osteoarthritis is the most common form of arthritis.  Osteoarthritis gradually worsens with time and currently no cure exists.  However,

15

the symptoms of osteoarthritis can be managed with pain medication such as acetaminophen, nonsteroidal anti-inflammatory drugs and muscle relaxers.   During his incarceration at Easterling, Plaintiff has been prescribed the following pain medications for his osteoarthritis [and resulting back pain]:   Tylenol (acetaminophen), Baclofen (muscle relaxant), Naproxen (nonsteroidal anti-inflammatory), Motrin [which is a brand name for Ibuprofen] (nonsteroidal anti-inflammatory), Robaxin (muscle relaxant) and Solumedrol (anti-inflammatory).  During the course of Plaintiff's treatment, Plaintiff missed no fewer than one hundred seventy-eight (178) doses of his prescribed pain medication.  In [my] best medical judgment, Plaintiff's osteoarthritis is best treated by the pain medication prescribed." *Defendant's Responses to Plaintiff's Interrogatories - Doc. No. 48* at 1-2.

It is clear from the evidentiary materials submitted by the defendant that medical personnel performed routine physical examinations of Luker regarding his complaints of back and hand pain.  Pursuant to an order issued by Dr. Darbouze, an  x-ray of Luker's lower spine was taken on April 15, 2011.  The results of this x-ray demonstrated "anatomic alignment of lumbar vertebrae.  The vertebral bodies show mild degenerative osteophytic spurring.  No fracture of subluxation is seen...." *Exhibit A (Part 2) to the Defendant's Special Report - Doc. No. 23-3* at 24.  The radiologist concluded that Luker suffered "[m]ild osteoarthritis of the lumbar spine."  *Id*.  Based on a review of Luker's medical records, numerous physical examinations, the recent radiological findings, and the fact that his complaints of back pain were constant and unvaried, Dr. Darbouze determined that pain management constituted the proper course of treatment.  From the time of his arrival at Easterling and continuing throughout his

16

confinement in this facility, Luker received medications commonly used for pain relief, anti-inflammation and muscle relaxation, including Tylenol, Motrin, Baclofen, Naproxen, Robaxin and Solumedrol, in an effort to alleviate his pain.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by Dr. Darbouze in addressing Luker's complaints of back pain did not violate his constitutional rights.  The medical care Luker received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  The allegations presented by Luker simply fail to establish deliberate indifference by the defendant.  *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation).  As is the issue here, whether Dr. Darbouze "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability.  *Adams*, 61 F.3d at 1545-1546.  In addition, an inmate's allegation that prison medical personnel did not diligently pursue alternative means of treating his condition "did not 'rise beyond negligence'... to the level of deliberate indifference."  *Id*.; *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that Luker received medical treatment for his back pain and that medical personnel rendered this treatment to Luker in accordance with their professional judgment.  In

addition, Luker has failed to present any evidence which indicates that Dr. Darbouze knew that the manner in which he provided treatment for Luker's back pain created a substantial risk to his patient's health and that with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence, significantly probative or otherwise, showing that the defendant acted with deliberate indifference to Luker's medical needs. Consequently, the court concludes that summary judgment is due to be granted in favor of Dr. Darbouze. *Carter*, 352 F.3d at 1350; *Holifield*, 115 F.3d at 1564 n.6; *Harris*, 65 F.3d at 916.

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED and ADJUDGED that:

1. The defendant's motion for summary judgment be GRANTED.

2. Judgment be GRANTED in favor of the defendants.

3. This case be DISMISSED with prejudice.

4. Costs be taxed against the plaintiff.

A separate Final Judgement will accompany this Memorandum Opinion and Order.

Done this 17th day of June, 2014.


/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE